Entered on Docket February 20, 2013

**Below is the Order of the Court.**

_Karen A. Overstreet_
_____
Karen A. Overstreet
U.S. Bankruptcy Judge
**(Dated as of Entered on Docket date above)**

_____

Karen A. Overstreet
Bankruptcy Judge
United States Courthouse
700 Stewart Street, Suite 6301
Seattle, WA 98101
206-370-5330

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| In re | Case No. 10-17952 |
| CONSOLIDATED MERIDIAN FUNDS,<br>a/k/a MERIDIAN INVESTORS TRUST, et al. | |
| Debtors. | |
| MARK CALVERT, as liquidating Trustee of<br>MERIDIAN INVESTORS TRUST, et al. | Adv. No. 12-01476 |
| Plaintiffs, | Adv. No. 12-01583 |
| v. | |
| JACK W. BROWN, et al. | ORDER DENYING DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT |
| Defendants. | ON WASHINGTON UFTA CLAIMS<br>AND DENYING IN PART |
| | BANKRUPTCY CODE §502 CLAIMS |
| MARGARET A. HEFTEL, et al. | |
| Defendants. | |

Order - 1

This matter came before the Court on February 8, 2013, on the concurrent motions for summary judgment (the "Motions") filed by Jack W. Brown and Margaret A. Heftel (collectively, "Defendants"). The Defendants were represented at the hearing by their counsel, Robert S. Banks, Jr., of Banks Law Office PC, and Michael Warren, of Pivotal Law Group PLLC, and the plaintiff, Mark Calvert (the "Trustee"), was represented by Heidi Craig Garcia of K&L Gates LLP. The Court heard oral argument at the hearing and has considered the records and pleadings filed in both cases (Adv. No. 12-01476 and Adv. No. 12-01583).

## I. BACKGROUND

The Trustee contends that these adversary proceedings arise from a massive Ponzi scheme perpetrated by Frederick Darren Berg ("Berg"). Berg is a debtor in his own individual bankruptcy proceeding, along with six other related entities. The Court is presiding over 12 bankruptcy cases involving debtors that are/were investment funds (the "Meridian Funds") and one affiliated entity formerly owned, managed or controlled by Berg. Those debtors have been substantively consolidated into one proceeding referred to hereinafter as the "Meridian Bankruptcy." On June 22, 2011, the Court entered an order confirming a consensual Chapter 11 plan in the Meridian Bankruptcy (the "Plan"). The Plan provides for the creation of the Liquidating Trust for the Substantively Consolidated Meridian Funds, a/k/a/ The Meridian Investors Trust. Mark Calvert, the named plaintiff in these adversary proceedings, is acting as the Liquidating Trustee of the Meridian Investors Trust, which holds all of the claims of the consolidated bankruptcy estates.

The Trustee filed 54 adversary proceedings against investors seeking the return of what the Trustee contends are fraudulent conveyances. The actions against the Defendants are two of those actions. In these actions, the Trustee seeks to recover transfers avoidable under Chapter V

Order - 2

of the Bankruptcy Code[1] as well as under Washington's Uniform Fraudulent Transfer Act, RCW 19.40.010 *et seq.* ("UFTA"). The Trustee seeks to recover transfers to Mr. Brown totaling $105,291.23 as "fictitious interest." Because the transfers were made outside the two-year statute of limitations for fraudulent transfers under Section 548, the Trustee seeks recovery of the funds only under the UFTA. In the case of Ms. Heftel, the Trustee seeks to recover $531,448.44 as "fictitious interest" under both state and federal fraudulent conveyance statutes.

## II.    FACTS

The facts pertinent to the Motions are not disputed.

### A.    <u>Brown</u>.

Defendant Jack Brown is an individual who made three loans to the Meridian Funds in exchange for promissory notes. Pursuant to the first note, Mr. Brown loaned $250,000 to Meridian Mortgage Investors Fund VIII, LLC on February 23, 2005. Declaration of Jack Brown ("Brown Decl."), Dkt. #58, Ex. A. The February 2005 Note provided for interest at the rate of 12.5% per annum and had a maturity date of February 28, 2006. According to the Brown Decl., this loan was renewed pursuant to a second note dated March 1, 2006, in the principal amount of $250,000. Brown Decl., ¶ 8, Ex. B. The March 2006 Note provided for interest at the rate of 12.5% per annum and had a maturity date of February 28, 2007. Pursuant to a third note, Mr. Brown loaned $250,000 to Meridian Mortgage Investors Fund VII, LLC on March 1, 2006. Brown Decl., Ex. C. The March 2006 Note provided for interest at the rate of 9.5% per annum and had a maturity date of February 28, 2007.

By separate letters, each dated January 15, 2007, Berg notified Mr. Brown that his two

---

[1]   Unless otherwise indicated, all Code, Chapter, Section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§101 *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

Order - 3

outstanding loans would mature in February of 2007, and he asked whether Mr. Brown wanted to renew the notes or be repaid the full amount owed. Brown Decl., Exs. D, E.  By letter dated January 17, 2007, Mr. Brown requested repayment of both $250,000 notes.  Brown Decl., Ex. F. On March 20, 2007, Mr. Brown was paid $605,291.23 in full satisfaction of both notes.  The Trustee seeks to recover $105,291.23, the excess paid to Mr. Brown over the principal amount of his $500,000 in loans.

### B.    Heftel.

Defendant Margaret Heftel is one of a number of defendants in the action filed against her.  Her ex-husband, Patrick Siemion, is also a defendant in that action and is representing himself *pro se*.  The Motions concern only Ms. Heftel's liability for "fictitious interest."  Ms. Heftel was married to her former husband when they made loans to the Meridian Funds in exchange for promissory notes.  Mr. Siemion and Ms. Heftel made numerous loans to various Meridian Funds starting in 2001 and continuing to 2010, totaling $2,093,263.36, and they received $2,624,711.80 in payments from the Meridian Funds; the last payment was received on June 16, 2010.  Ms. Heftel does not dispute the amounts loaned or the payments received for purposes of the Motions.  Declaration of Margaret Heftel, Dkt. #61.  Ms. Heftel and Mr. Siemion were divorced on October 25, 2006.  The Trustee seeks to recover $531,448.44 in "fictitious interest" consisting of payments to Mr. Siemion and Ms. Heftel in excess of the amount they loaned.

### C.    Berg Criminal Plea.

The lead case in the consolidated Meridian Bankruptcy was filed on July 9, 2010.  On October 14, 2010, federal authorities charged Berg with money laundering and wire fraud.[2]

---

[2] *United States v. Berg*, No. 2:10-cr-00310-RAJ (W.D. Wash. Oct. 14, 2010), Dkt. #4.

Order - 4

Berg, in a plea agreement entered on August 2, 2011, admitted that he had knowingly and willfully devised and executed a scheme and artifice for the purpose of defrauding investors. As part of the scheme, Berg "raised over $280 million from approximately 500 investors in his investment funds," while diverting "approximately $100 million that he used for his personal benefit and to promote the scheme to defraud."[3] On February 9, 2012, Berg was sentenced to 18 years of imprisonment, three years of supervised release, and restitution.[4]

Since the filing of the Complaint, discovery has been stayed and the parties have engaged only in an exchange of initial documents pursuant to the Court's Scheduling Order (Dkt. #48 in Brown; Dkt. #52 in Heftel) and the Pre-Trial Order (Dkt. #52 in Brown; Dkt. #58 in Heftel, *See* ¶7 related to the stay of discovery). Pending in each case are also the Defendants' Motions to Withdraw the Reference which have been transmitted to the District Court. Because the District Court has not ruled on the Motions to Withdraw the Reference, this Court may continue to hear and determine pretrial motions in this matter. Local Rule W.D. Wash. Bankr. 5011-1, 9015-1; Local Rule W.D. Wash. 87.

## III.    ISSUES

The Defendants concede that the Court recently entered an order denying summary judgment in another Meridian case, *Calvert v. Foster Radford, et al.*, 12-01505, Motion for Summary Judgment by Sun Granite Investments LLC, Dkt. #84 (January 19, 2013) (the "Sun Granite Order"), where an identical issue was raised. Although the Motions were filed before the Sun Granite Order was entered, the hearing on the Motions did not occur until after the entry of that order. In the Sun Granite Order, the Court addressed two issues: (1) whether a borrower's

---

[3]  The Trustee contends that Berg misstated both the number of investors in the Meridian Funds and the dollar amount of his fraud. *See Calvert v. Foster Radford*, 12-01505, Plaintiff's Response to Motion, Dkt. #74, fn. 28.

[4]  *United States v. Berg*, No. 2:10-cr-00310-RAJ (W.D. Wash. Feb. 9, 2012), Dkt. #95.

Order - 5

payment of principal and a reasonable rate of interest due on an enforceable promissory note

constitutes satisfaction of an antecedent debt within the meaning of Bankruptcy Code

§548(d)(2)(A) and RCW 19.40.031(a); and (2) whether the movant, Sun Granite Investments,

LLC, accepted the repayments at issue for value and in good faith within the meaning of Section

548(c) and RCW 19.40.081(a).  On these issues, the Court held that (i) under existing Ninth

Circuit authorities, payments from the Meridian Funds constituting lawful interest did not

constitute satisfaction of an antecedent debt within the meaning of either the state or federal

fraudulent conveyance statutes, and therefore did not constitute reasonably equivalent value, and

(ii) because of the stay of discovery, it was premature to rule on whether Sun Granite

Investments, LLC was a good faith recipient of the transfers at issue.

Defendants Brown and Heftel have recast the issue raised in their Motions in this way:

whether there is an unwritten exception in the unambiguous Washington statute that provides

that a transfer is fraudulent where the transferor receives property without receiving "reasonably

equivalent value," which is specifically defined to mean the satisfaction of an antecedent debt.

RCW 19.40.041, RCW 19.40.031.  The Defendants contend that in the Sun Granite Order, the

Court failed to consider their argument that an equity investor should be treated differently than a

lender in the UFTA analysis.  They argue that a debtor's repayment of an equity investment

would not qualify as satisfaction of an antecedent debt under the state UFTA, whereas the

debtor's repayment of a loan with reasonable interest should qualify as satisfaction of an

antecedent debt.  For the following reasons, the Court will deny the Motions for the same reasons

articulated in the Sun Granite Order, which is incorporated herein in its entirety by this reference.

Defendants also seek dismissal of the Trustee's claim under Section 502 of the

Bankruptcy Code.  As discussed below, the Court will grant that relief as to Mr. Brown, but deny

Order - 6

that relief as to Ms. Heftel.

**IV.  LAW**

     **A.  <u>Summary Judgment Standard</u>.**

     To prevail on a motion for summary judgment, the moving party must show by reference to pleadings, discovery, admissions, and affidavits, if any, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Rule 56(a)(c), Fed.R.Civ.P.; Rule 7056, Fed.R.Bank.P.  If the moving party meets its burden, the burden of production then shifts to the nonmoving party, who must produce by admissible evidence "specific facts showing that there is a genuine issue for trial."  Rule 7056(e).  The moving party is entitled to a judgment as a matter of law if the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 91 L.Ed. 2d 265, 106 S.Ct. 2548 (1986).  *See also In re Irizarry*, 171 B.R. 874 (9th Cir. BAP 1994).

     **B.  <u>The Statutory Framework</u>.**

     The Court examined the statutory framework under state and federal fraudulent conveyance laws in detail in the Sun Granite Order and will not repeat that here, except to emphasize the one important distinction between the state statute and its federal counterpart:  an intentionally fraudulent transfer under state law may not be avoided as against a transferee who received the transfer in good faith and for a reasonably equivalent value, RCW 19.40.081(a), whereas an intentionally fraudulent transfer under Section 548(a)(1)(A) may be avoided even if the transfer was supported by reasonably equivalent value and received by the transferee in good faith.  In the latter case, the transferee may still rely on its defense under Section 548(c).  Under both statutes, a transferee can prevent the avoidance of a constructively fraudulent transfer by

Order - 7

proving that he or she received the transfer in exchange for reasonably equivalent value. 11

U.S.C. §548(a)(1)(B); RCW 19.040.041(a)(2).

The Defendants seek summary judgment only under the state statutes, RCW 19.40.041

(intentional and constructive fraud; present and future creditors), RCW 19.40.051 (constructive

fraud; present creditors), and RCW 19.40.081 (defenses). Under these statutes, the Trustee has

the burden of proving the lack of reasonably equivalent value supporting the transfers he

challenges.

### C. **Reasonably Equivalent Value.**

Like the defendant in *Calvert v. Radford*, the Defendants urge the Court to adopt the

reasoning of those courts which have held that payment of commercially reasonable interest on

an enforceable promissory note should be treated as payment on an antecedent debt and therefore

not be recoverable as a fraudulent conveyance.[5]  There are only two courts that have reached this

specific holding:  *In re Unified Commercial Capital, Inc.*, 260 B.R. 343 (Bankr. W.D. N.Y.

2001) and *In re Carrozzella & Richardson*, 286 B.R. 480 (D. Conn. 2002).   The Court discussed

these cases in depth in the Sun Granite Order, rejecting their analysis in light of the bright line

approach taken by the Ninth Circuit in *In re United Energy Corp.*, 944 F.2d 589, 596 (9th Cir.

1991) and *Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008).  Defendants posit that the Ninth

Circuit's decision in *Donell* would have been different had the interest rate on the notes at issue

there (20% every 90 days) been lower, like the annual rates of interest on the notes at issue in

these cases (6.75%-14%).  They correctly note that in the opening line of the *Donell* opinion, the

court states "Robert Kowell [the transferee defendant] found an investment opportunity too good

to be true."  533 F.3d 762, 766.

---

[5]  For purposes of the Motions, the Court assumes that the rates of interest in the Brown and Heftel notes are "commercially reasonable."

Order - 8

The Defendants' argument has some simplistic appeal. The state statute does not require "equal" or "equivalent" value in exchange for a transfer from the debtor, but rather, "reasonably equivalent value." By unambiguous statutory language, the definition of "value" under state law includes "payment on antecedent debt." RCW 19.40.031(a). Interest payments, the Defendants argue, are the quintessential form of payment on an antecedent debt and a return of interest at a rate of 6.75% per annum should certainly be deemed closer to being "reasonably equivalent" than a return of 20% over 90 days, as was the case in *Donell*.

The problem with the Defendants' argument, however, is that the Ninth Circuit in *Donell* and *United Energy* followed the rationale of the courts adopting a bright line approach, that *any* return to a lender or investor in a Ponzi scheme in excess of the principal investment will not be treated as value, and therefore cannot be counted in determining whether the return was "reasonably equivalent." The *Donell* court specifically adopted a "netting rule" used to determine the liability of the transferee in the first instance – that is, whether the transferee received more from the debtor than the amount of the transferee's principal investment. Construing a California fraudulent conveyance statute similar to the UFTA, the *Donell* court concluded that "[i]f the net is positive, the receiver has established liability…." *Donell*, 533 F.3d at 772. Although the *Donell* court noted that the defendant's rate of return there was "too good to be true," no where in the opinion does the court make that the basis of its holding. Instead, the court's conclusion focused on the fact that the "return" was not from earnings or investments made by the debtor, but instead from cash fraudulently obtained from other unsuspecting investors in the debtor's unlawful Ponzi scheme. In those circumstances, the court characterized the right of the investor to repayment as being a right to restitution for amounts advanced to the debtor rather than a right under an enforceable note.

Order - 9

There is no question that the courts have struggled with the differing facts in these cases, where the consequences of the scheme deprive some investors of their life savings and render other investors defendants in lawsuits where significant sums of money, long since paid to them, are subject to recapture. Acknowledging these harsh results, the Ninth Circuit adopted a rule intended to even out the results as between investors who get paid and those who do not. Investors who get paid are protected by the various statutes of limitation; they may keep those payments made to them outside the statute of limitations, but they must share the pain by giving up anything they received in excess of their investment within the applicable statute of limitations. The case law reflects that the courts are not in agreement as to how the pain should be shared in these unfortunate cases.

Cases cited by the Defendants illustrate the dispute in the courts. *Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715 (S.D.N.Y. 2012), supplemented (May 15, 2012), addressed investments made in connection with the massive Ponzi scheme perpetrated by Bernard Madoff. Although the Defendants correctly point out that the interests the investors had in the Madoff case were securities, and not the kind of promissory notes at issue in this case, the court still noted the general rules articulated by *Donell* when the return paid to investors is not from an actual investment, but instead comes from the investments made by other investors. Citing *Donell*, the court held:

> Notwithstanding these arguments, however, the Court concludes that
> those transfers from Madoff Securities to defendants that exceeded the
> return of defendants' principal, *i.e.,* that constituted profits, were not
> "for value." Unlike the situation under § 546(e), Congress has here
> created no "safe harbor" to shelter receipts that might otherwise be
> subject to avoidance. Accordingly, in this context, the transfers must
> be assessed on the basis of what they really were; and they really were
> artificial transfers designed to further the fraud, rather than any true
> return on investments.

Order - 10

> It is not surprising, therefore, that every circuit court to address this issue has concluded that an investor's profits from a Ponzi scheme, whether paper profits or actual transfers, are not "for value." *See Donell v. Kowell,* 533 F.3d 762, 771–72 (9th Cir.2008) ("Amounts transferred by the Ponzi scheme perpetrator to the investor are netted against the initial amounts invested by that individual. If the net is positive, the receiver has established liability....").

476 B.R. 715, 725. Although the court did distinguish *Carrozzella* on the ground that it involved investors who received a return of principal and a "reasonable" rate of interest, there is nothing in the opinion to suggest that the court, if presented with facts like those in *Carrozzella*, would actually adopt its holding.

Defendants argue that they are not investors in the equity sense – they are traditional lenders seeking return only of reasonable interest in exchange for the time value of their loans. The notes attached to the Brown Declaration and the Heftel Declaration, however, look more like investments than traditional loans. The notes refer to disclosure packages and subscription agreements, which are normally associated with investments rather than commercial loans. The complaints in these cases allege that the sole business of the Meridian Funds was to offer and sell promissory notes to investors and that investors were told that the sole purpose of the investment was to enable the Meridian Funds to invest on their behalf in seller-financed real estate contracts, hard money loans, real estate and mortgage-back securities. Complaint, Dkt. # 1, ¶16 (12-01476, 12-01583). Investors like Mr. Brown and Ms. Heftel were promised rates of return on their investments in the form of interest payments. The Ninth Circuit, however, has not adopted a rule which treats victims of a Ponzi scheme differently depending upon whether their investment can be characterized as a financial investment, equity investment or loan.

In another case cited by the Defendants, *In re Image Masters, Inc.*, 421 B.R. 164 (Bankr. E.D. Pa. 2009), the trustee asserted both intentional and constructive fraud claims against lending

Order - 11

institutions which had received payments on homeowner loans as part of a complex Ponzi

scheme. The court dismissed the trustee's claims against the lenders because it found that the

transfers were in exchange for equivalent value. *Id.* at 183. The facts in that case, however, are

very different from the facts in these cases. None of the consolidated debtors in *Image Masters*

had any direct relationship with the defendant lenders. Instead, homeowners refinanced their

homes directly with the lenders, who took mortgages against the homes. The homeowners then

separately contracted with the debtors to extract the "equity" from their homes by issuing to the

debtors a "wraparound" mortgage on their homes. Pursuant to the agreements with the debtors,

the debtors were to pay the homeowners' refinancing lenders. There was no allegation in the

complaints that the conventional lenders had any knowledge of the wraparound mortgages or the

agreements between the homeowners and the debtors. As part of the scheme, the debtors made

payments in excess of $23 million to the defendant lenders. The court concluded that because

the debtors' payments to the lenders reduced the debtors' debt to the homeowners, the debtors

received "value" for those payments, and that because the reduction in the debt was dollar-for-

dollar, it was also equivalent. *Id.* at 179. The court dismissed all of the fraud claims because it

found that the lenders received the payments in good faith and for reasonably equivalent value.

The case of *In re Fin. Federated Title & Trust, Inc.*, 309 F.3d 1325 (11th Cir. 2002), cited

by the Defendants, deals with services. The trustee in that case sued a former employee of the

debtor to recover amounts paid to her as commissions during the debtor's operation of a Ponzi

scheme. "It is not disputed that her responsibilities included organizing the office by

computerizing functions, coordinating office networking, performing payroll, commission and

banking functions, managing employees and acting as human resource director…." *Id.* at 1327,

1328. The court followed *In re Universal Clearing House Co.*, 60 B.R. 985 (D. Utah 1986), in

Order - 12

concluding that the determination of "value" should focus on the value of the goods and services provided rather than the impact the goods and services had on the bankrupt entity (*i.e.*, deepening insolvency and furtherance of the Ponzi scheme). *Id.*at 1332. The case deals with the question of how service providers to a debtor engaged in a Ponzi scheme should be treated – a question the Ninth Circuit has yet to answer and a question that need not be answered in these cases.

Finally, Defendants cite *In re M&M Mktg., LLC*, 2013 WL 152526 (Bankr. D. Neb. Jan. 15, 2013), where the court cited *Donell* with approval, but noted that other courts, in the right circumstances, might find the repayment of interest equivalent value, citing *Carrozzella*. The facts in the case before the *M&M* court, however, did involve what the court thought was an excessively high rate of interest, 25% in 90 days.

The foregoing cases illustrate quite clearly the unsettled state of the law on the difficult issue presented in these cases. The Court is very sympathetic to the plight of the Defendants. The Court has concluded, however, that the Ninth Circuit has declined to embrace the approach taken in *Carrozzella*. The only difference between these cases and *Donell* is the rate of interest to be paid to the investors on their investments in a Ponzi scheme. The Ninth Circuit has not attached any significance to that distinction. For that reason, the Court concludes that the payment of interest to the Defendants pursuant to the terms of their notes can be subject to the Trustee's fraudulent conveyance attack.

**D.       Good Faith.**

Neither party briefed the legal issues related to good faith in connection with the Motions. For the purpose of determining whether the Defendants are entitled to summary judgment on the ground that they gave reasonably equivalent value to the Meridian Funds, good faith is only relevant to the Trustee's intentional fraud claims under RCW 19.40.041(a)(1) and

Order - 13

RCW 19.40.081(a).[6]  The Trustee does not appear to strenuously contest the good faith of Mr.

Brown, but has submitted with the Declaration of Heidi Garcia documents he believes call into

question the good faith of Ms. Heftel.  In any case, consistent with the Sun Granite Order, given

that discovery in these cases has been stayed, the Court does not believe it appropriate to address

that clearly factual issue at this time.

  **E.**  <u>**Section 502.**</u>

  The complaints include as a final cause of action a claim under Section 502 to disallow

any claim the Defendants may make in the Meridian Bankruptcy.  Mr. Brown argues that

because he has not filed a proof of claim in the bankruptcy, this cause of action should be

dismissed as to him.  Ms. Heftel, on the other hand, has filed a proof of claim.

  Section 502(d) prevents a transferee of a transfer that is avoidable under Sections 544 or

548 from receiving any distribution from the bankruptcy proceeding until and unless such entity

has paid the amount of any liability to the estate it has for an avoidable transfer.  If Ms. Heftel is

found to have received a fraudulent transfer under Section 548, Section 502(d) would require

disallowance of her right to any recovery on her filed proof of claim.  Therefore, the Section 502

claim is perfectly appropriate as to her and need not be dismissed.  Because Mr. Brown has not

filed a proof of claim, however, Section 502 is, at this time, irrelevant.  In the event that Mr.

Brown files a proof of claim, the Trustee's right to object to that claim and assert Section 502(d)

is preserved and can be raised at that time.[7]

---

[6]  Good faith is not relevant to the Trustee's claims that the transfers to the Defendants were constructively
fraudulent as the statute does not require the transferee to take the transfers in good faith; the statute requires only
that the transfer be supported by reasonably equivalent value.  RCW 19.40.041(a)(2).
[7]  The *Donell* case includes a discussion concerning whether the defendant there could offset his liability to the
receiver against an alleged claim against the debtor, with the court concluding that no offset was permissible.  533
F.3d, 762, 778-79.  That discussion does not refer to Section 502, however, so this Court has not analyzed whether
the discussion in *Donell* is applicable to the arguments in this case.

Order - 14

1

**ORDER**

2

3
NOW, THEREFORE, for the foregoing reasons, it is HEREBY ORDERED as follows:

4
1.      The Trustee's cause of action against Defendant Brown under 11 U.S.C. §502 is

5
dismissed.

6
2.      Except as provided in Paragraph 1, the Motions are DENIED.

7

8
///END OF ORDER///

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Order - 15